Foulberg v. Goldman Sachs Group, Inc., et al. Mr. Hanson, you'd like to reserve three minutes for rebuttal, is that correct? I would, that's correct. Very good, you may proceed. Good morning, and may it please the Court, Adam Hanson, on behalf of Appellant Foulberg and the certified class. For years, Goldman Sachs retained several costly, poorly performing proprietary investment funds in its Employees 401k plan. Goldman Sachs did this not because the funds were good for the plan, but because retaining the funds was good for Goldman. The District Court erred in several respects when it held as a matter of law that Goldman's conduct satisfied ERISA. And I want to focus on two of those errors today. First, Goldman's breach of its fiduciary duties, and second, Foulberg's prohibited transaction claim. Could I just make sure I understand the nature of the duty of loyalty claim? You are claiming that the retention of these specific plans was the product of self-interested action. That's correct. You're not claiming that there was a pervasive, everything in the plan that was Goldman was there for bad reasons or was the product of some kind of bias. We've focused the litigation on the five funds at issue, which follows directly from the Supreme Court's analysis. Yeah, except actually, there's a great focus on two other plans. And I take it the idea there is that what happened with those plans gives rise to an inference that this is how they generally operated? I'm talking about the Emerging Markets Equity Fund and Strategic Income Fund. Other funds within the same plan, of course. We look holistically at the plan, and if you look at loyalty, start with the fee rebates. So what we see on both sides of the ledger, Goldman offers fee rebates to its customers from these challenged GSAM funds, but not to plan participants. Goldman then goes and gets- That's the rebate issue. I was focused just on the what gets picked to be in the plan set of issues. Sure. And you made a pretty good case, it seemed to me, that the inclusion of these plans was, at a minimum, mysterious. But they turned out to be good performers at the end of the day, I take it. Well, so there's three prongs to disloyalty. There's performance, what we're talking about, and I'm happy to go into that. There's the fee rebates, and there are the investment vehicles. So strictly looking at performance, three of the funds, the mid cap, the large cap, and the high yield, performed very badly for years on end. The plaintiff's expert- And they were removed eventually. They were removed very belatedly. Yeah, so your argument with respect to the plans that you are challenging is not that they were selected for bad reasons. It's that they were retained longer than they should have been for bad reasons. Correct. These plans date to the 1990s, well beyond the statute of limitations. But the Supreme Court's been clear in Tybill, you have to review them for retention on a regular basis. And that's where the disloyal and the improved conduct came in. Here's where I'm just having some difficulty. The stock market goes up and down. Different funds have good years and bad years. You want to take a longer view. How long a view do you take? To what extent do you take into account any feeling that the people running this are actually very good at what they do and should be given a greater chance? How are we to decide or how is a jury to decide if it is ultimately going to be a jury question, if you're right? What evidence is necessary to demonstrate that a reasonable fact finder could say without question that these things should have been done, that any reasonable fund manager would have taken them out in 2015 instead of 2016 or in 2012 instead of 2016? I think you can bifurcate that question into cost and performance. It's very straightforward with costs, because costs, it's just it was available for a less expensive cost, a less expensive share class. There were fee rebates were available, and Goldman simply didn't do that, which meant less money in the pockets of participants, more money in the pockets of Goldman. That's simple. Now, when it comes to performance. Well, that's not so simple, and that's a separate question that I'd like to get into at some later point. I think I was focusing on performance, and maybe I'm misreading your brief. I thought the brief made distinct points that there were underperforming funds that got retained, and there were these issues with respect to fees and costs that seems to me are a broader issue than just these particular five. That's right. So focusing just on performance, look at what plaintiff's expert Fender looked at. You look at one year. You look at three year, five year, ten year. You look at risk adjusted. You look at absolute basis. You look at how they perform relative to similar asset classes, similar peer groups. And you don't, we agree, one bad year, one bad month doesn't mean you've got to cut bait. But if you have multiple years, multiple metrics signaling bad performance over a longer period of time, you know, the Supreme Court sentiment's got to come out. Among other things, then, it is critical that you have an expert whose testimony is admissible, who is an appropriate expert, who testifies, and a reasonable jury could believe him, that there's no basis on which this performance could be found acceptable. He said no reasonable fiduciary would have retained these. And that's good enough to get you to a jury, assuming that evidence is admitted. Is that right? Absolutely. And that's certainly not the only evidence we have. I mean, you see, with respect to performance, there was a two-tiered system where there was lobbying campaigns from fund managers at Goldman, where there was an ethical wall for outside funds. There was, you know, essentially just when the independent advisor would say not broadly recommended, that was pretty much good enough to keep an outside fund out, but that's not necessarily good enough to keep a Goldman fund out. I thought there were some outside funds. Two questions on that. I thought there were some outside funds that were not broadly recommended. And I keep calling it the not for everyone category in the not broadly recommended. And also, in spite, I think there was some testimony that Rocatan, if I'm pronouncing that correctly, and some of this was useful, and they never did move these funds to sell during the time that they were. So those are the two questions I have about that. One is weren't there others that were under this not broadly recommended, non-proprietary funds? And didn't they never move this into sell? The answer to your first question is yes. But if you look at the funds holistically, the vast majority of the not broadly recommended were these problematic. What was the number? I thought it was five and four. Four. I think it was four out of six is my recollection. Okay. I'm going to have to go back to the record on that. And, look, this one data point, not broadly recommended, we're not claiming that alone is enough to say the second that happens, it has to come out. It just means give it some extra scrutiny. Then you look at the actual performance of some of these funds, which, as Fahlberg testified, were quite bad over a long period of time. The evidence starts to pile up. And that really gets to the heart of it. And what you're saying is that when you take these things, of course you could draw a different inference from how many non-proprietary funds were in that category from Rokatan. That's a fact question. Right. But when you take the fact that there were more Goldman funds that were in that category and you add it to your expert's testimony about the performance of these five funds and you add it to the fact that in other cases, which are not the ones you're challenging, it's very hard to understand how the Goldman fund got chosen, and there's no explanation contemporaneously as to why that happened. All of that adds up to a jury question about bias in favor of Goldman Sachs proprietors. It is very much a forest for the trees analysis for these fiduciary duties. And I think that's a critical point where the district court lost its way here, which is you can't, as is true in many cases, pick up this one piece of evidence and say, well, you know, they did have one or two over here. But when you look at all this evidence holistically, it clearly points in the direction of a fiduciary breach. I want to take note of the time. I do want to discuss. Can I ask you, with the presider's permission, some questions? Yes, please. Because I have trouble just understanding how these rebates work, so don't take these as, like, hospital questions. I'm just trying to understand it. Is there anything in the record that tells us why this April 2009 cutoff date was in the contract between Hewitt and Goldman with respect to rebates? In terms of parole evidence, no, not that I'm aware of. Both parties have operated from the premise that the contract speaks for itself. Of course, there's another provision in the contract that says, just to be very clear, the plan and its participants are not eligible for these rebates. So even the 2009 cutoff is a bit of a belt in suspenders. In terms of how rebates work, if I may proceed with that question, it's akin to a discount. It's like buying a new car. You have a sticker price, but certain customers get money back. And looking at those rebates is very critical to understanding what the true cost is in the marketplace. So here we usually think of basis points, which is a hundredth of a percent. So if it's 50 basis points means every year the fund manager gets half a percent of the total funds for his fee. That's the sticker price. If there's a fee rebate, some of that percentage is given back, sometimes to the record keeper, sometimes to the plan participants directly. So your position, I take it, just to make sure I understand this, is that even if there were some good reason why Hewitt didn't get these discounts and therefore they weren't passed on to the plan, it doesn't matter, at least for this purpose, at least for the duty of loyalty argument, it doesn't matter why these rebates weren't available to the proprietary funds. All that matters is they weren't. And there were other funds that were comparable where rebates were available. And so once again your argument is why on earth would a manager who is pursuing the best interests of the retirees keep funds that are costing you more when there are ones that would cost less that are available? That's exactly right. And the contract just illustrates that this was bargained away, right? At the bargaining table, presumably Goldman got something of value by saying, we're going to wall off the 401K plan of our employees from eligibility for these fee rebates. And at the end of the day, this issue is no more complicated than saying contracts don't trump fiduciary duties. ERISA says that directly in 1108B8. I again want to note the time. I do want to make sure there's time to discuss prohibited transactions. I'm happy to do it now. I'm happy to do it at rebuttal. But I want to distinguish then, I'm seeing your point about the loyalty. I'm not necessarily seeing your point on prohibited transactions vis-a-vis at least this specific situation because there seems to be a question, a pure question of law here. Does the statute mean that you have to get, in effect, the plan has to get most favored nation treatment? That if there's anybody out there who gets a rebate, we need to get a rebate or else it's a prohibited transaction. Yes. But I'm having, this is where I wonder about what the rationale is for limiting the rebates because if it is the case, and I don't know what the record shows about other plans or other investment instruments getting rebates, but if the deal is there's a fixed criterion and anybody who falls into that criterion, and let me try and make this clearer with maybe an example. I realize that the Goldman plan is a very big plan, so they have a lot of bargaining power in this area. But suppose it was a smaller company and they are asking for rebates for a particular, you know, an internal fund, and they're told no because, frankly, you, we, are not big enough. We only give this rebate to very big companies. Why would that be a prohibited transaction? What is there about even the language in the statute that says if you are getting the same terms as anybody else would get, you don't get a rebate because you don't qualify, and if you weren't proprietary, you'd be in the same boat. You don't get the rebate because you're like the company itself. Why is that a conflict of interest or a prohibited transaction or a violation of the language of the statute? I think two responses. The first is just the statutory or, in this case, the regulatory language in the exception. It just says other shareholders. It doesn't say comparable shareholders or shareholders with comparable bargaining power. And the second and- Well, it says you're getting the same terms as other shareholders, and I'm saying why do you say the same terms means the same rebate rather than the same eligibility or ineligibility for rebates based on objective criteria? Right, and that's the second part of my answer, which is I hope this isn't too strong, but I think it would be a fool's errand to try to engage in the sort of analysis where, okay, are our employees more comparable to a weaker bargaining power customer, a stronger bargaining power customer? That would invite all sorts of creative, to put it diplomatically, business judgment, creative lawyer judgment, and run counter to not just the text, but I think the purpose of the rule, which is to avoid these sort of shady inside deals. And so I'm not even sure how the analysis would proceed to look at a group of employees and say, well, gee, how much bargaining power do they have?  No, no, it's the bargaining power. It's just what are the criteria, the objective criteria that are laid down for eligibility for rebates? I think that would be problematic as well, because any, you could just do the plan starts with the letter P, or born before January. Yeah, but this is not the only area of the law in which a fact finder has to look at, is this a reasonable criterion that there is a reasonable explanation for, or is this something that's tricked up to exclude particular people? Right. I mean, we do that across the board from Title VII to all kinds of other situations. Understood. And I think, just returning to the language, it doesn't require trickery or a gerrymander. It just says all other shareholders. We have shareholders here that are getting the discount. The employees aren't. I take the point. Yeah. Okay. And we have kept you up past your time. We thank you. And why don't we, you've reserved three minutes for rebuttal. Why don't we hear from counsel for the appellee? We have Attorney Peppermint. Yes, Your Honor. May it please the Court, Richard Peppermint, on behalf of the defendants. Let me, at the outset, make a couple of points in response to the judge's questions. First, Judge Lynch, and I don't know whether this matters to your analysis. There's no jury trial in this case. This would have been a better case. Listen, if it was me, I'll tell you a secret. When I was a district judge, I never gave summary judgment in a bench trial case because I could just, why would I want the Court of Appeals to decide what might a reasonable lynch have thought at trial? I would be the reasonable lynch. I would call in a few witnesses, most of the evidence is by documentation anyway, make fact findings, and then the question would be, is Lynch's finding clearly erroneous and not what a reasonable judge might have done after the fact at trial? But that's, but jury, I always think of it in terms of jury. Yeah. Because that's what we're talking about is, is there something here to be tried to the fact finder? Correct. I only pointed that out because Your Honor referenced jury a couple of times. And it is notable that there's no claim that there were credibility determinations here that are important to the United States. Well, there's a very, very important one, isn't there? I mean, this witness fender, is it, the expert? Well. Says in so many words, in my opinion as an expert in this area, no reasonable manager, fund manager on behalf of a plan would have made this decision. Now, maybe that's not admissible, but I didn't see anything where the judge says, I'm disregarding this person's testimony altogether because he's not a proper expert, his methodology is suspect, blah, blah, blah. I thought it was sort of disregarded. Obviously, that opinion by Mr. Federer is a conclusion. Let me talk about what the evidence showed. First on the not broadly recommended ratings, and this is in the record at 2990. Three of the challenge Goldman Sachs funds were rated not broadly recommended. Incidentally, two of the challenge Goldman Sachs funds, the short duration government and the core fixed income funds were rated by. And Your Honor was correct that four non-Goldman Sachs investment options were rated not broadly recommended. And in terms of the committee's consideration of the ratings, it is notable that two PIMCO funds, that the ratings were changed to sell, the committee investigated it and kept those funds in the plan, notwithstanding that they had been downgraded to sell. And I point this out just to show that I think the evidence shows that the same standard was applied to Goldman Sachs funds as non-Goldman Sachs funds. In terms of performance, in Mr. Federer's opinion, Mr. Federer's opinion is the committee should have removed the challenge funds by January 1st, 2014 at the latest. Now let's look at what the evidence showed. The evidence showed that three of the challenge Goldman Sachs funds underperformed in 2010 and 2011. In response to that, the committee reviewed all of the Goldman Sachs funds between November 2010 and January 2012. The committee ended up, as part of that review, removing three Goldman Sachs funds from the plans, but keeping the challenge funds on the grounds that looking at their previous performance over the last three and five years, that they fell within a range of reasonableness. Now once you get beyond this review in 2012, there are really two more years that follow, before the class period. 2012, all five of the challenge Goldman Sachs funds outperformed their benchmark. All five. In 2013, in terms of the three funds that supposedly underperformed, two of the three funds outperformed their benchmark. The only fund that did not was the mid-cap value fund, which underperformed its benchmark by a matter of basis points. So the claim is- Could you just explain to me, as an ignoramus here, what determines the benchmark? So there are two benchmarks. So oftentimes mutual funds in their prospectus identify a benchmark. Sometimes what funds do is they have a peer group, and that peer group becomes the benchmark. If you look in the analyses, there's usually two benchmarks that are prescribed. But my point is, in 2012, all five outperformed their benchmark. In 2013, in terms of the three supposedly underperforming funds, two of the three outperformed their benchmark. So is this a question of how do we bracket the time period? Is that the dispute? Sort of like the patriots are great if you start in 2001, not so great if you start in 2021? Is that really the dispute between you two here? No, no, no. All I'm saying is if the claim is you should have removed them by January 1, 2014 at the latest, and that's the claim, right? That's the beginning of the class period. And I will note that the class period is identified here not because of some performance issue or some sort of conduct issue. It's just the six-year ERISA statute of repose. They just went back as far as they could under the statute of repose. But as of January 1, 2014, if you're the committee, you're going to remove three investment options that for the last two years have outperformed their benchmark? That's what I'm asking you. Is the plaintiff's theory that they're taking – is the plaintiff taking a broader temporal perspective than the defendant? Because the plaintiff is asserting, as a matter of fact, these underperformed over a time period. Is it the selection of the time period? Where is the factual – yeah. So, I mean, honestly, Your Honor, I think what the plaintiffs are saying is that with the benefit of hindsight, these funds should have been removed sooner. They were removed in 2016 and 2017, two and a half years before the lawsuit was filed. But with the benefit of hindsight, they should have been removed earlier. Now, they point to January 1, 2014 simply because that's the beginning of their class period. That's as far back as they could sue under the statute of repose. If you look during the class period, all five funds were rated by Morningstar or Lipper as either above average or average between 2013 and 2015. Performance issues started to arise with one of the funds in December of 2015 and with two of the other three in March 2016 and in May 2016. All of the funds except one were removed the end of that year, December of 2016. One last fund wasn't removed until April of 2017 because the committee was looking for a viable alternative. I mean, the performance claims here – you know, the Supreme Court in Hughes said that courts need to give due regard to the range of reasonable judgments that fiduciaries can exercise. And I think it is – I mean, Monday morning quarterbacking, you know, put by hindsight – the claim that, you know, 2016 was a little too late. You know, based on what we know now, it should have been 2015 or it should have been 2014. I mean, it doesn't work. Now, Your Honor, Judge Lynch, where did April 1, 2009 came from? That was the date of the agreement between Goldman Sachs, Asset Management, and Hewitt. It was entered into on April 1, 2009. And the agreement between Goldman Sachs and Hewitt was that Goldman Sachs Asset Management would share its management fees for new accounts that were open with Goldman Sachs Asset Management going forward. So April 1, 2009 is just the date of the agreement. Now, in terms of whether that was a breach of the duty of loyalty. First of all, my friend, Mr. Hanson, refers generically to Goldman. But the entity that entered into the agreement with Hewitt was Goldman Sachs Asset Management. Which is different than the plan. Which owes no fiduciary duty. Right, no fiduciary duty to anybody. Right. The committee was not a party to that agreement. The plan was not a party to that agreement. The committee didn't negotiate it. Yeah, but what Mr. Hanson eventually told me, and I think this is probably right, is that the issue, putting aside the prohibited transaction issue, which is a more technical analysis. But on the duty of loyalty front, it doesn't really matter whether this was a good agreement or a bad agreement or a fair agreement or an unfair agreement or whether it discriminated against or in favor of Goldman. What matters is the plan knows that it is not eligible for certain discounts from the Goldman investment vehicles. But if there are comparable investment vehicles that use the same kinds of strategies and that are not, for some reason, poorly managed and not recommended by Rocatan or whatever else. They can get those discounts from PIMCO or Fidelity or Vanguard. So that's the question, is that true or not true? And there's evidence in the record that they could have gotten the deal from Vanguard that they were quite legitimately, for reasons of Goldman's own strategies and Hewitt's own negotiations, not eligible for Goldman. It's not true and it's not in the record. So here's what is in the record, just in terms of what the committee did. The committee had Alan Wilmot and Chris Cedar on behalf of the committee go to Goldman Sachs Asset Management and say, will you waive this exclusion on behalf of the fund? And Goldman Sachs Asset Management declined on the ground that, with respect to its other customers, it could not treat Goldman Sachs' plan more favorable. There is nothing in the record, nothing, that there were comparable funds to the five challenge funds that would have been otherwise exactly the same, comparable. But those funds had fee rebates available to them. Now, there is nothing that the claim in this case from the beginning, in paragraph 74 of the complaint, it's the claim that the plaintiff makes in his brief at page six. The claim was that there were fee rebates that were readily available. And the committee just didn't avail itself of that. The facts are that in terms of the fee rebates that were available, they were not available because of Goldman Sachs Asset Management's agreement with Hewitt. And the plaintiff never developed evidence that, all right, let's look at the mid-cap value fund. There was this comparable fund that was available, but if you had switched over there, you'd be giving up nothing. It's six of one, half dozen of the other. But there you would get the fee rebates. There is nothing in the record on that because it's just not how this case was litigated. The case was litigated that the committee was asleep at the switch and failed to avail itself of readily available fee rebates. Now, just on, and I do think just in terms of what the roles are here, and I'm sorry if I, Judge Lynch, if I got overly animated. In terms of what the roles are here, Goldman Sachs Asset Management is not a fiduciary. It is, under the words of ERISA, an affiliated party. The Goldman Sachs Group Inc. is the sponsor of the plan. It has the responsibility for selecting and replacing and removing the retirement committee members. I mean, it is the retirement committee that is the named fiduciary responsible for selecting and monitoring the plan investments. Now, in terms of the selection criteria, I mean, Judge Lynch, you are correct that that evidence goes to two funds, the Emerging Market Equities Fund and the Strategic Income Fund, that are not in this case. They were not challenged in the complaint. The complaint has a footnote that says that they are not challenged because they outperformed their benchmark over the five-year period during the time they were in their plan. The class excludes those two funds, and Judge Ramos correctly in his summary judgment ruling held that they're not at issue. To the extent that the claim is here that the retirement committee employed an inherently flawed process in selecting new funds, the five funds at issue here were selected between 1990 and 2002, more than a decade before the class period. I'm happy to address the evidence on selection. I think Judge Ramos treated that evidence exactly correct. But, I mean, I think the broader headline point is that that evidence has minimal, if any, relevance to the monitoring and removal issue here. On fees, the less- I think one of the things you're saying, to put it in pruder terms than you're putting it, is that they're kind of cherry-picking different bits and pieces and saying, well, this looks weird and that looks weird, but that has to do with funds that aren't really the ones at issue here. And then there are some issues that they can raise with whether non-Goldman managers got invited to be considered when they got recommendations from outside or things like that. But there's not a comprehensive survey of how were Goldman funds treated vis-a-vis other funds, right? There's no one big global study of all the non-Goldman funds versus all the Goldman funds. Correct, correct. And just in terms of that evidence, I do want to address the fees issue. But in terms of that evidence, the evidence on the selection process is one person at GSAM sent an email to one of the co-chairs of the committee attaching a one-pager on the Emerging Markets Equity Fund and said, is this something that the committee would consider? The co-chairman forwarded that email to the committee secretary and replied to him, that's something that the secretary and the full committee will have to opine on. I mean, that is the evidence of the, quote, lobbying campaign. A single email forwarding a one-pager on the Emerging Markets Equity Fund. Now look, in terms of fees, the claim on fees is that the committee erred here by offering these funds as mutual funds rather than as separate accounts. And let me just quickly go through the evidence there. The evidence is, if you look at the whole plan investment menu, there were 12 mutual funds, 15 separate accounts, and 7 collective investment trusts. A mix of investment vehicles. Of the 12 mutual funds, 5 of the 12 mutual funds were non-Goldman Sachs funds. So again, no evidence that the Goldman Sachs funds were treated differently than non-Goldman Sachs funds. The evidence shows that the committee regularly reviewed the fees charged by all investment options. Two things in the record on that. JA-932, JA-958. They show that each time the committee compared the mutual fund fees with a peer group of other mutual funds, and also with the fees charged by alternative investment vehicles like separate accounts and collective trusts. The worst performing mutual fund on the list, you can look at it, was not a Goldman Sachs fund. It was the Emerging Markets Debt Fund offered by Ashmore, which both underperformed its mutual fund benchmark and also underperformed all of the other investment vehicles. For the 5 Goldman Sachs challenge funds, the difference in basis points between mutual funds and separate accounts were anywhere between 0 and 20 basis points. The MidCap Value Fund, its management fees were 74 basis points. For separate accounts, it was a range of between 60 and 74 basis points. Now, Alan Willman testified, the ERISA counsel for the plan, that he advised the committee that the committee could not use separate accounts from Goldman Sachs Asset Management unless Goldman Sachs Asset Management waived its fees. And I just want to end on this. The case that the plaintiffs rely on on fees is, in my mind, emblematic of the problem of the plaintiff's overall case. That case is Spano versus Boeing. It was a 2014 decision of the Southern District of Illinois where there was a claim of mutual funds versus separate accounts. In that case, the evidence showed that the committee had kept mutual funds rather than separate accounts because it wanted to offer those funds as mutual funds to benefit Boeing's corporate relationship with State Street and City Street. So there was a reason why they were sacrificing their duty of loyalty. They wanted to benefit the corporate banking relationship with State Street. There was also evidence in the record that the separate accounts were superior to the mutual funds. No such evidence here. And that really, the problem with plaintiff's case, when this case started in the complaint- They made exactly that allegation.  And then that didn't pan out, and we're now on a different theory. Now we're quibbling. Now, the original theory of the case was that these Goldman Sachs funds were hemorrhaging assets, that large investors were redeeming their shares, and they were hemorrhaging assets. So the committee was desperate to keep the plans, investments, and the mutual funds. That allegation, which got the plaintiffs over a motion to dismiss, did not pan out in discovery. And now we're sort of dealing with quibbling. And the claim that, well, for the benefit of hindsight, 2016 was too late. It should have been a year earlier, or it should have been two years earlier. They lost the argument for why these fiduciaries would have been disloyal. And are left with, you know, like I said, 74 basis points versus 60 to 74 basis points. As if the committee would breach its fiduciary duties to, like, save zero to 14 basis points on a fund. Okay. Thank you very much, counsel. We have your argument. Attorney Hanson, you have three minutes for rebuttal, and we're going to hold you tightly to those three minutes. I'll hold myself tightly to those three minutes. Three points in rebuttal. First, with respect to performance, just encourage the court to look at the plaintiff's expert reports. This gets into the weeds very fast. But, in fact, plaintiff's expert is the only expert that used the data that was provided in real time to Goldman in the reports from the independent advisor to the committee. And in that sense, the report offered in response by Goldman is the one that uses more cherry-picked data and a cherry-picked time horizon. As I said in my principal argument, the plaintiff's expert used different time horizons, absolute performance, risk-adjusted performance. There's no hiding the ball in the data in the plaintiff's expert report and found that these funds had consistently underperformed by 2014. Secondly, you know, most of the discussion today, appropriately so, has been about performance. But I want to reiterate that there is just very little in the record about any consideration by the investment committee about costs. We do not see discussion in the committee notes about how can we lower these costs, how can we seek these fee rebates, how can we get better investment vehicles. While we're talking about the fees, Mr. Peppermint hit a point that I actually had here in my notes for a question for you. Do you have an example of a fund that was similar to one of the Goldman Sachs funds that did in fact offer fee rebates? In other words, you know, we have these challenge funds. They're not eligible for fee rebates from Goldman Sachs. I see that point. And if there's another comparable fund that's out there, then it would be very strange why they didn't opt for that one rather than this one. Do we have one for any of them that you can point to? Yeah, I point to the record at Joint Appendix 2006 and Joint Appendix 932. That goes through in the expert report. It walks through. This is the basis point for the Goldman funds, and these are the lower basis points for the comparable funds. And what you'll see is they're typically in the range of 19 to 25 basis points less. That's a quarter of a percent. It sounds small, but, you know, we're talking about millions of dollars, of course, so it does add up. The last point I wanted to hit is respect to this we had an agreement by a non-fiduciary. We had to stick to it. I would just close and reiterate that that's not good enough. You ask, you push, you cajole, you renegotiate the agreement, you pay the rebate itself to make up for it, or, of course, at the end of the day, you just say, well, we're hemmed in here. We've got to go outside of these proprietary funds and get another comparable option where these fee rebates would be available, as everyone agrees that they were. Unless the court has further questions, I would ask the court to reverse the district court's judgment and remand further proceedings. Thank you very much. Two points. Number one, very well argued on both sides. Thank you very much for your presentations. We will take it under advisement.